ed unfair competition, and that defendant was chargeable as a contributor thereto and would be enjoined.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, §§ 78–86.

Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

In Equity. On motion for preliminary injunction.

Fish, Richardson, Herrick & Neave, for complainant.
George C. Wing and George C. Wing, Jr., for defendant.

---

## THE ASK.

(District Court, S. D. New York. October 21, 1907. On Motion to Amend Libel October 31, 1907.)

1. SHIPPING—VESSEL UNDER CHARTER—LIABILITY FOR DAMAGE TO CARGO.
    The owner of a chartered vessel, which becomes unseaworthy on the voyage to the port of loading, but fails to report her disability on her arrival, in consequence of which a cargo is procured or prepared for shipment, is liable for the damage legally resulting to the charterer from such inability to take it or from delay in making repairs.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 449.]

**2.** SAME—CONSTRUCTION OF CHARTER PARTY—DELAY FOR REPAIRS.

A steamer was chartered by a time charter for four round trips to West India or Central or South American ports. The charter party clearly contemplated the use for the carriage of tropical fruits, but the charterer was not limited to such use. It also provided that, in case of breakdown or delay for repairs for more than 24 hours, charter hire should cease until she was in an efficient state to resume service. She made three trips, each time bringing a cargo of bananas. On her arrival at the same port of loading for a similar cargo on her fourth trip her furnaces had become defective, rendering a delay for temporary repairs necessary. *Held,* that the fact that the last cutting of bananas for the season was then ready to be made, and that owing to her delay she was unable to take the cargo intended for her, did not authorize the charterer to terminate the charter, nor affect her liability, which, under the charter party, was limited to the loss of hire during the time of the delay in making repairs.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 136.]

On Motion to Amend Libel.

**3.** ADMIRALTY—PLEADING—AMENDMENT OF LIBEL.

An amendment to a libel cannot be allowed after the hearing, where it would substantially change the cause of action and require for its support other and different proof, and especially where such proof would be inconsistent with the evidence given on the hearing.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 1, Admiralty, § 525.]

**4.** SHIPPING—LOSS OF CARGO—RIGHT OF CHARTERER TO RECOVER DAMAGES.

A charterer of a vessel to carry a cargo of which he is not the owner, but merely the agent for its sale on commission, has no legal interest therein which will support an action against the vessel for its loss or damage; nor can he maintain such action as trustee for the owner, who was not a party to the charter.

In Admiralty. Libel in rem against the Ask and in personam against her owner for breach of contract.

Libelant was time charterer of the Ask for four round trips from North Atlantic ports to the West Indies and/or any Central or South American port (with some trifling exceptions) north of the River Plate. The charter party is entitled, in prominent type, "Time Charter, West India Fruit Trade." It provides for building a deck in the vessel's hold "strong enough to hold tiers of fruit." It prohibits the crew from carrying "bananas or other merchandise for their own account," and declares that the "donkey boiler shall not be worked when bananas are carried." The vessel is forbidden under ordinary circumstances to stop for salvage purposes "on account of the perishable nature of the cargoes that this steamer is intended to carry." As matter of fact the Ask did carry bananas from Nipe Bay to North Atlantic ports for three trips, and the loss and damage sued for occurred while she was upon her fourth trip for the same purpose. The foregoing are all the provisions of the charter party emphasizing the proven fact that the specific object of the charter was to get a vessel for the carriage of perishable tropical fruit. The range of occupations, however, permitted by the charter party was far greater than merely carrying fruit. The carriage of any "lawful merchandise, including petroleum or its product in cases," was contracted for; and, as above indicated, the ports to which the Ask might be sent included many not known in the fruit trade. Charter moneys were to be paid each calendar month, and hire was to continue "until her delivery to owners (unless lost) at a port in the United States." The vessel was in the usual form warranted as "in every way fitted for the service," and the owners further covenanted to "maintain her in a thoroughly efficient state in hull and machinery for and during the services, guaranteeing to maintain the boilers in a condition to bear a working pressure of at least 60 pounds (and this pressure to be carried continuously) during the whole term" of the charter. The breakdown clause is as follows: "In the event of * * * breakdown of machinery or damage pre-

venting the working of the steamer for more than 24 hours at sea, the payment of hire shall cease until she be again in an efficient state to resume her service; * * * also any loss of time * * * from repairs to hull and machinery, which are for owner's account, not being complete after cargo and coals are on board and hour of sailing has been fixed by charterers, and notice given to captain, the time lost is for the steamer's account."

On her fourth trip the Ask arrived at Nipe Bay on the afternoon of October 31st. On the morning of November 1st the master went ashore and saw his charterers, "to find out where we were to sail for." At 10 a. m. he returned to his ship and was then informed by his chief engineer that the crown sheets in two out of the three furnaces "were down; there were pockets in them." Believing that this would necessitate only a reduction of steam pressure, and that to a degree not vitiating the steam warranty above noted, the master gave orders to continue to prepare for loading. About two hours later the engineer came again, saying that all three furnaces had pockets in them, and that it might be unsafe to proceed, and that at all events the vessel could not sail until after a survey had been held upon her. Early on the afternoon of the same day the master went ashore and reported this condition of affairs to the charterers, who had in the meantime cut and prepared for shipment a cargo of bananas, which was ruined before the Ask could sail with temporary repairs. This was the last cargo of the season. There was no other business at Nipe Bay. The charterers repudiated all liability upon the charter party, and now sue for all the charter hire paid on account of this fourth round trip, all expenses incurred by them in respect thereof, and for the value of the lost bananas. The cutting of these bananas had begun as soon as the Ask was in the harbor. Some of them had undoubtedly been removed from the plants' before the master could have had any opportunity to report the unseaworthy condition of his vessel; and by the time he did make such report the cargo was entirely ready for shipment.

When the vessel began her outward voyage on the last round trip there is nothing in the case to show that she was not in a seaworthy condition. I find that when she arrived at Nipe Bay she was in an unseaworthy condition for the carriage of any cargo. That change in condition was caused by the undue heating of the crown sheets of the furnaces, rendered possible by a deposit of greasy dirt on the upper side of the crown sheets, which deposit was the result of negligence in the management of the filter, a part of the condensing apparatus. The consequent deformation of the crown sheets should have been visible upon an investigation by a competent engineer before arrival in Nipe, and I conclude as matter of fact that the vessel's condition existed on arrival, should have been known on arrival, and her owner is responsible for all the consequences of failing to communicate to the charterers what he was bound to know, as fully as if he had actually known it. It appeared upon the trial that the libelant's only interest in the lost cargo of bananas was as a commission merchant, and it did not appear that any advances had been actually made thereon.

Wheeler, Cortis & Haight, for libelant.
Convers & Kirlin, for claimant and respondent.

HOUGH, District Judge. The claim for loss of bananas becomes academic, through the unexpected testimony showing that libelant had lost nothing by the destruction thereof. The Habil (D. C.) 100 Fed. 120. But my view of that question may render clearer the disposition of the rest of the case. This is not an instance of premature cutting of perishable fruit, as in The Curlew, 55 Fed. 1003, 5 C. C. A. 386, and The Disa (D. C.) 153 Fed. 322. These cases recognize the duty on the charterer's part to give timely and reasonable notice of inability to perform his expected contractual obligation. As soon, therefore, as the Ask had reported and said nothing as to such actually existing inability, the charterer had full right to expect transportation of his

cargo; and it was well known to both parties that that cargo consisted of bananas, that would soon rot after cutting, if not removed from the tropical climate. The right above recognized is not expressed in the words of the charter party, but grows out of the relation of the parties. It could hardly be contended that the ship might conceal her known defects, load her cargo, and then remain in port making repairs, with no greater liability than temporary loss of charter hire; yet to that extent must an argument go which denies all liability for failure to communicate known disabilities at a time when the other party has a right to presume fitness and upon such presumption is changing his own position for the worse. Whether the liability is in rem, as well as personal, need not be considered.

This cause of action, however, having been swept away by the evidence, there is left the inquiry whether the failure to inform the charterers of the Ask's unseaworthiness, with the result that the last cargo of the Nipe Bay crop could not be transported upon her, afforded any reason for throwing up the charter. This query is very different from that relating to the loss of the cut bananas. The charter party did not engage the Ask to carry that cargo or none, nor is there anything in the evidence showing on the shipowner's part any knowledge or duty to know that with the cutting of November 1st the banana crop was ended. Laying aside all questions arising from the negligence and silence of the engineer and the consequent misinformation of the captain, the material facts are simply these: The Ask broke down and required temporary repairs. When such repairs were made she could carry 60 pounds of steam. For such contingencies the charter party provides a stipulated measure of damage—i. e., loss of charter hire—and no other measure is permissible, unless a covenant could be found in the contract obliging the vessel to transport the last cargo of the season from Nipe Bay, and no other. It is too plain for argument that no such contract was made.

It follows that the libelant should have a decree for the amount tendered at the beginning of the trial, viz., $259. If, however, libelant thinks that under the principles above laid down more than that sum is recoverable, it may take a reference, all costs after tender to be on the libelant unless more than $259 be recovered. If the tender be accepted without reference, costs of the trial must be paid by libelant.

On motion to amend libel, made after testimony closed and case submitted and argued.

HOUGH, District Judge. The amendment proposes to state that libelant at the times in the libel set forth was trustee for the Dumois Nipe Company, that the bananas in question were intrusted to libelant by said company, and that libelant "is accountable to said Dumois Nipe Company for the same." "Amendments in matters of substance should not be allowed on the hearing, unless the justice of the case requires it, and then to conform to the proof; and in no case should an amendment be allowed on the hearing which would change the entire cause of action." The Habil (D. C.) 100 Fed., at page 123. Even more stringently is the rule enforced after hearing, both in admiralty and eq-

uity. The Thomas Melville (D. C.) 31 Fed. 486; Gubbins v. Laughtenschlager (C. C.) 75 Fed. 615. These rules have recently been restated in our own circuit in The Minnetonka, 146 Fed. 509, 77 C. C. A. 217, and The Hamilton, 146 Fed. 724, 77 C. C. A. 150.

The amendment here prayed for is most substantial. I incline to think it changes the cause of action, and am sure it does not conform to the proof. If libelant had originally pleaded that the charter party was made by it as trustee for the Dumois Nipe Company, the contract, nevertheless, would have been that of libelant, and not that of its cestui que trust; and, though the fruits of any action for breach thereof would have inured to the benefit of the Dumois Nipe Company, such breach, if usable as a basis for action, must have been an infraction by ship or owner of the contract made with libelant, and not with its cestui que trust. If, therefore, the Cuba Planters' Company were a trustee, it alone could sue for breach; but that company suffered no damage, as positively sworn to by Mr. Dumois. In truth, the testimony already taken shows that it was not a trustee, but merely a selling agent, as also clearly sworn to; and from these vital statements Mr. Dumois cannot be permitted to depart, or contradict his own testimony by trying to show, in the language of the amendment, that libelant "is accountable to said Dumois Nipe Company for the" bananas in question.

The reason for a trustee being entitled to recover damages which do not fall upon his private purse is that he has the legal title to that which is injured; but it is impossible to read Mr. Dumois's frank statements, made in entire ignorance of the legal effect thereof, without feeling that libelant never had the legal title to said bananas. It is thus clear that what this motion really seeks is, not to make the pleadings conform to existing proof, or merely to change the title or capacity of the libelant and recover on testimony already adduced (The Hamilton, supra; Morgan v. Halberstadt, 60 Fed. 592, 9 C. C. A. 147; Van Doren v. Pennsylvania R. R. Co., 93 Fed. 260, 35 C. C. A. 282), but first to change the pleadings by putting the cause of action into the ownership of another legal entity, and then endeavor to vary or explain away material evidence by further testimony. Such a proceeding I think entirely without warrant or precedent and beyond the power of any court.

The motion to amend is therefore denied.