Henry DUMATRAIT

v.

TUG NICK V, Her Engines, Furniture, Apparel, etc., Twenty Grand Oil Field Service, Inc., Twenty Grand Oil Company, Inc., and BARGE T.G. 109, Her Engines, Furniture, Apparel, etc.

Admiralty No. 3033.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 18, 1962.

J. Barbee Winston, New Orleans, La., for libellant.

Charles Kohlmeyer, Jr., and Wayne S. Woody, New Orleans, La., for respondents.

CHRISTENBERRY, Chief Judge.

Henry Dumatrait, as owner of the M/V CHAR SAN, and as assignee of the personal injury claim of his companion on the vessel, seeks to recover damages from respondents, the Pushboat NICK V and its tow, Barge TG–109. Proper claims having been filed by the owners of the vessels proceeded against and customary bonds in an amount suitable to libellant having been posted, the cases proceeded to trial to the Court for an interlocutory decree as to liability with all witnesses testifying in person. The Court having heard evidence and the arguments of proctors, and having taken time to consider the matters hereby makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### I.

The collision giving rise to this litigation occurred in the Atchafalaya River a short distance above the Intracoastal Canal. The M/V CHAR SAN is a steel hull cabin cruiser, 34 feet in length, 11 feet in width and powered by two 200 h. p. Chrysler engines. The NICK V is a steel hull push type vessel approximately 47 feet in length by 10½ feet in width. She is powered by a 165 h. p. diesel engine and is pilothouse controlled. The Barge TG–109 is a deck barge approximately 110 feet long by 30 feet in width.

### II.

On a bright and clear afternoon in July, 1955, the NICK V was made up to the stern of and pushing the Barge TG–109 down a straight stretch of the Atchafalata River south of Morgan City, approximately 200 feet off the right descending bank. In the area of the collision, the Atchafalaya River is approximately 1200 to 1500 feet wide.

### III.

The CHAR SAN, with Dumatrait at the controls and her only passenger, Muse, sleeping in a bunk below deck, was proceeding upriver at approximately 12 to 16 miles an hour.

A short time before entering the river, Dumatrait had moored the CHAR SAN alongside another cabin cruiser, the STELLA MARIS, and had been talking with an acquaintance who was the operator of that vessel, Dr. Crookshank. The two cruisers weighed anchor and started upriver toward Morgan City at approximately the same time. The STELLA MARIS, with Dr. Crookshank at the wheel, crossed the river and was proceeding upriver favoring the left descending bank, and the CHAR SAN with Dumatrait at the wheel, proceeded upriver about 50 feet off the right descending bank. There was ample space for the NICK V and her tow to pass between the two vessels, and likewise, there was ample space for the two cruisers to pass between the NICK V and the respective banks of the river which they were favoring, and if all vessels had held their courses there would have been no danger of collision. For some reason which Dumatrait was unable to explain, whether because he was not observing that

which he should have seen, or because of a tendency on the part of the CHAR SAN to fall off to her starboard when one of her engines killed (which might have happened at this time), she suddenly and without warning cut across the bow of the NICK V and her tow and collided with Barge TG-109. The point of impact was on the port forward corner of the Barge TG-109 and the port quarter of the CHAR SAN.

### IV.

I find that the CHAR SAN was traveling at a speed of approximately 12 to 16 miles an hour and that at such a speed the vessel tended to plane so that the change in trim and the raising of her bows blocked out the vision of Dumatrait, her operator, other than a side vision to his right. Under these circumstances, he could not see (without changing his position) in front of him or to his left. He was operating his cabin craft, therefore, with his vision completely blocked out insofar as the NICK V and her tow were concerned. I find this action on his part to constitute such gross negligence as to cause full blame for the collision to be visited on him.

### V.

The Barge TG-109 had loaded aboard her two Halliburton trucks, the tops of which were higher than the eye level of the master of the NICK V as he was standing at the wheel of the tug. The two trucks, however, were loaded on each side of the barge so that there was a pathway between them approximately five to seven feet wide, and a clear view was afforded the master of the NICK V through the slot between the trucks. He could not, however, see over the tops of the trucks, so that his vision was to that extent impaired. I find, however, that this fact had no connection with the collision for the reasons hereinafter set forth.

### VI.

The master of the NICK V had not posted a lookout on the head of the tow, but two Halliburton employees were working on the deck of the barge and were generally in the same position as a lookout would have been had the lookout been posted. One testified that he saw the CHAR SAN from the time that it entered the Atchafalaya River and kept it in view the entire time until the collision. The other employee saw the CHAR SAN but paid no attention to it. The testimony of the Halliburton employee who had the CHAR SAN under observation was to the effect that the CHAR SAN swerved sharply to its right when only a few feet off the bow of the TG-109, cut across the head of the tow and struck the port corner of the TG-109 with its port quarter. He stated that the accident took place so quickly and the CHAR SAN was so close to the head of the tow when it changed course that there was no time for him to turn around to warn the master of the NICK V. Accordingly, I find that if a lookout had been posted on the head of the tow and if the lookout had given prompt and proper warning to the master of the NICK V, such warning would have availed nothing and the NICK V could have done nothing to have avoided the collision, except to blow a danger signal, reverse her engines and put her wheel hard to starboard. I find that none of these actions would have availed anything and that the collision would have taken place even if all such courses of procedure had been followed.

### VII.

In the bright sunlight then existing, the Captain of the NICK V, Ribaudi, felt that the operators of both small boats obviously had him in clear view and he felt that to blow a passing signal to either would have been confusing to the other, since if all vessels maintained their courses, the STELLA MARIS would pass him port-to-port and the CHAR SAN would pass him starboard-to-starboard at about the same time. I find that his seamanship and decision in this regard were obviously correct and that his failure to blow a passing signal was not a contributing cause of the collision. Moreover, if he had blown the passing signal when the two small boats

were approximately parallel in the river, it would be impossible for him to determine whether to blow one or two blasts and great confusion certainly might have arisen if he had chosen to do so.

### VIII.

Moreover, I find that the failure to blow a passing signal, as well as the failure to blow a danger signal, could not have contributed to the collision for the reason that the STELLA MARIS, when practically the same distance from the CHAR SAN as was the NICK V, had blown a signal on two occasions, but in neither case did Dumatrait hear the whistle. Her whistle, according to the testimony, was about as loud as that of the NICK V. Thus, there is no reason to expect that a whistle signal from the NICK V, whether a passing signal or a danger signal, would have been heard or heeded by Dumatrait, and I find as a fact that he would not have heard a whistle signal from NICK V if it had been blown.

### IX.

Apparently libellant recognized his fault and approached the case on a basis of attempting to charge the NICK V with sufficient fault to cause me to find that both vessels were mutually at fault and that a divided damages decree should be entered. The bases for his charges of fault against the NICK V were as follows:

(a) The failure to keep a lookout—but I find that if a lookout were to have been stationed and were to have been attentive to his duties, the lookout could not have warned the NICK V of the impending collision in sufficient time for the NICK V to have taken any evasive action. The NICK V and her tow could not be maneuvered in such a way as to be controlled like an automobile on the highway, and I find that any change in course and speed on the part of the NICK V and her tow could not have been accomplished quickly enough to have averted the collision in the short time that was available between the change of course and the moment of collision.

(b) It is charged that the failure of the NICK V to sound signals likewise is a fault which requires a divided damages decree, but, as I have indicated above, I find that it was not incumbent upon the master of the NICK V to have sounded signals in a situation like this and moreover that if he had blown his whistle, the whistle signal would not have been heard by the libellant, so the failure to have blown a signal cannot be classified as a fault.

(c) Libellant contends that there is a strong presumption that both vessels are at fault when a collision occurs in clear weather and that the NICK V has not overcome this presumption. I recognize that a collision between two vessels in clear weather in a broad waterway may generally indicate both vessels to have been at fault, but in this instance I can find no faullt attributable to the NICK V in view of my finding that the CHAR SAN cut across the bows of her tow at the last moment.

### CONCLUSIONS OF LAW

### I.

This Court has jurisdiction of the parties and of the subject matter of this suit.

### II.

On the basis of the foregoing findings, I conclude that no fault is attributable to the NICK V and her tow, and that the entire fault for the collision lies on the CHAR SAN and her operator, Dumatrait.

### III.

██ Even if I am in error in the foregoing conclusion and if some fault may be attributable to NICK V for the reasons advanced by libellant, I conclude that her fault, compared with that of the CHAR SAN, was so minor and that of the CHAR SAN so gross as to require me to apply the major-minor fault rule, which excuses the vessel guilty of the minor fault and places the entire blame for the collision on the vessel guilty of major fault. Queenston Heights, 5 Cir.,

**604**

220 F.2d 120, certiorari denied Esso Shipping Co. v. Compania De Maderas De Caribarien, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736; and numerous other cases decided in this Circuit.

There should be a decree for respondent dismissing libellant's claim at libellant's cost.